Jones, Chief Judge,
delivered the opinion of the court;
This is a suit by a subcontractor for an additional fee in a cost-plus-fixed-fee subcontract. The subcontract was later assigned to the Government.
Plaintiff alleges that it is entitled to an additional fee on the ground that it was required to do certain work outside the scope of the contract and that the contracting officer acted arbitrarily in denying the plaintiff’s claim for an additional fee.
The prime contractor was the Esslinger-Misch Company. The subcontract was between the prime contractor and plaintiff, E. B. Kaiser Co.
The case is before the court on a special act of Congress which grants to the United States Court of Claims the authority to pass upon the merits and to render final judgment. It is provided, however, in this special act “That the enactment of this legislation shall not be construed as an inference of liability on the part of the United States Government.”
The trial commissioner William E. Day, heard the testimony and has filed his findings of fact in detail which we have approved and adopted.
*265 The prime contract was entered into on March 20, 1942, and provided for the construction of an ordnance plant near Terre Haute, Indiana. The plant was to consist of loading buildings, administration buildings, shops, railroads, steam lines, air lines, electric lines, telephone lines, and other equipment. The total cost of the completed plant was to be more than $20,000,000.
In the light of the need for completion of the project, which was to be used in the manufacture of munitions for use during World War II, the prime contractor obtained permission to let a subcontract on a cost-plus-fixed-fee basis for the installation of the plumbing, heating, ventilating, and compressed air systems. The estimated cost as disclosed in the invitation to bid Was the sum of $1,988,984, including labor and materials.
At the time the invitation to bid and the plot plan were furnished the plaintiff, sufficient drawings and specifications were not available to enable the prime contractor to ask for bids on a lump-sum basis. It was well known that several months would be required for the preparation of complete drawings and specifications. In view of the urgent need for the completion of the project, the prime contractor, in order to save time, asked for and received permission from the defendant, in accordance with Article I-A(4) (a) of the principal contract, to let the subcontract for the installation of the plumbing, heating, ventilation, and compressed air systems at the Vigo Ordnance Plant on a cost-plus-fixed-fee basis.
Plaintiff, along with other bidders, was furnished a copy of such plans as were available, including a plot plan of the general layout of the entire ordnance plant. In addition, the defendant’s architect-engineer for the project furnished plaintiff an estimate as to the cost of all labor and materials for the installation of the plumbing, heating, and ventilation systems. The plaintiff submitted a fixed fee in the sum of $45,000 to include tools, and equipment for the installation of the plumbing, heating, ventilation and air piping at the Vigo Ordnance Plant near Terre Haute, Indiana.
*266 The subcontract dated July 21, 1942, contained a description of the work as follows:
The Subcontractor shall in the shortest possible time furnish under the general supervision of the Constructor (Contractor) the labor, materials, tools, machinery, equipment, facilities, supplies, and services not furnished by the Constructor (Contractor) or the Government and do all things necessary for the construction and completion of the following work:
To construct, install and complete all plumbing, heating, ventilating and compressed air systems in six (6) Detonator Lines, four (4) Artillery Primer Lines, one (1) Percussion Element Line, in the Maintenance Area, and in the following buildings in the Administration Area: Staff Houses, Fire and Police Building, Laboratory, Telephone and Cafeteria Building.
The prime contractor furnished the materials to the plaintiff and the plaintiff was reimbursed for all the amounts paid to employees except the salary of the general superintendent. The subcontract stipulated that plaintiff would furnish the general superintendent on a nonreimbursable basis.
There is no issue as to the cost of labor and materials. It is plaintiff’s contention that it was required to do a great deal more work than the subcontract provided should be done, and it was required by the contracting officer to do work outside the scope of the contract, and that consequently its fixed fee for supervising work, which had been placed at $45,000, should be increased by an additional sum of $43,417.50 (later reduced by adjustment payments to $40,722.50).
The plaintiff claimed that extra work on the boiler houses, high pressure steam lines, sewage disposal plant and water treatment plant, pump plant, and reservoir was not included in the work called for by the contract, largely on the basis that the power houses and steam lines involved power rather than heating, and that, normally, heating systems do not include steam beyond 15 pounds working pressure. He claimed that the fixed fee should be proportionately increased in sufficient amount to cover this extra work. The area engineer denied the claim for additional fixed fee, *267 except certain small items which were involved in change orders as set out in finding 20. The contracting officer allowed some $3,000 additional fixed fee covering certain change orders, but held that the remaining items were included within the terms of the contract itself.
We quote a portion of the contracting officer’s statement of basis of denial:
the boiler houses and steam lines are integral parts of one or the other of the systems referred to in the Subcontract ; that while the steam generated in these boiler houses is hi excess of fifteen pounds working pressure, it is used solely for heating purposes and not for generating of power * * *.
The decision was approved and the Acting Chief of Engineers found that the boiler houses and steam lines were a part of the plumbing and heating work described in the subcontract and within the scope thereof, and that, since the subcontract provides that no adjustment in the fixed fee would be made because of the errors or omissions in estimating the cost of the work, no further increase could be granted, other than items 2 and 3 involving the sewage disposal and water plants. The allowance of these adjustments reduced the claim to the net sum indicated above.
Plaintiff accepted these small additional allowances for work done on the sewage disposal and water treatment plants but did so under protest claiming that it was entitled to a much larger fee.
By virtue of the assignment of the subcontract to the defendant that had been made on June 4, 1943, the defendant had assumed responsibility for the claims previously filed by defendant with the .prime contractor. The subcontract contained the following provision:
Provided, however, that there shall be no adjustment in the amount of the fixed fee as provided herein, nor any claim therefor because of any errors and/or omissions made in computing the estimated cost of the construction of the work under this subcontract, or where the actual cost varies from the estimated cost.
As to the larger items in the claim of plaintiff relating to boiler houses and high pressure steam lines, the plot plan, *268 which, is in evidence as plaintiff’s exhibit No. 7, shows a total of five boiler houses, three in the detonator line areas and two in the artillery primer line areas. Our trial commissioner, who heard the evidence, found that plaintiff “has failed to establish by clear and satisfactory evidence that the boiler house and high pressure steam line work was outside the scope of its subcontract work.”
The trial commissioner likewise found that plaintiff had failed to establish by clear and satisfactory evidence that it had not been fully paid for the extra work performed by it on the sewage disposal plant and the water treatment plant, and that the estimates of cost relied upon by the plaintiff as to these items included major items of equipment which were not installed by the plaintiff’s employees. After full consideration of the record, we have adopted these findings.
We have considered the findings of the contract engineer, Captain Bailey, pertinent portions of which are set out in finding 22, and the findings of the Acting Chief of Engineers, portions of which are set out in finding 24, and we find no evidence of arbitrary or capricious action on the part of these officials. In fact, their decisions are apparently based on the provisions in the subcontract and the facts as disclosed by the evidence.
The plaintiff is not entitled to recover and the petition is dismissed.
It is so ordered.
Need, Justice (Bet.), sitting by designation; LittletoN, Judge (Bet.); LaRAmoRE, Judge; and MadbeN, Judge, concur.
Whitaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day,[1] and the briefs and *269 argument of counsel, makes findings of fact as follows:
1. The plaintiff is a corporation organized and existing under the laws of the State of Illinois with its office and place of business located at 625 Webster Avenue, Chicago, Illinois. The plaintiff was organized in 1888 and is engaged in the mechanical engineering business doing construction work on plumbing, heating, ventilating, power piping, and various other pressure systems.
The plaintiff claims by this suit an increase in the amount of the fixed fee under a cost-plus-fixed-fee subcontract with the prime contractor described in the next finding, due to extra work which it says was ordered by such prime contractor.
2. The Esslinger-Misch Company (hereinafter sometimes referred to as the prime contractor or constructor) was a corporation organized and existing under the laws of the State of Michigan with its office and place of business located at 159 East Columbia Street, Detroit, Michigan.
3. On March 20,1942, The Esslinger-Misch Company and the United States (hereinafter referred to as the Government or as defendant) entered into Collateral Fixed Fee Construction-Management Contract No. W559 eng-5949 (hereinafter sometimes referred to as the principal contract), which contract was approved by direction of the Under Secretary of War on April 11, 1942, and provided in part as follows:
Article I. — Description of Project
1. The project shall be located at or near Terre Haute, Indiana (Vigo Ordnance Plant), and is generally described as follows:
a. A plant (hereinafter described as the “Project”) for the loading and assembling of detonators, artillery primers, and percussion elements (hereinafter sometimes referred to as “Ammunition”), having an estimated average daily capacity based on working twenty-four (24) hours per day as follows:
(a) 8 lines each to load 200,000 detonators..
(b) 4 lines each to load 200,000 artillery primers.
(c) 1 line loading 1,000,000 percussion elements.
2. Said Project shall consist of loading buildings, administration buildings, shops, railroads, roads, steam lines, air lines, electric lines,, telephone lines, fencing, lighting, power house, dormitories, water and sewer *270 systems, staff dwellings, mess ball, cafeterias, hospital, guard quarters, fire-fighting equipment and housing thereof, and other buildings and equipment necessary or appropriate for a loading plant of the approximate capacity aforesaid, with storage buildings adequate for about 30 days’ supply of incoming materials and about 60 days’ production of finished product.
❖ ❖ # ❖ ❖
Article I-A. — General Statement of Worh and Services $ $ $ ‡
4. The Constructor’s fixed fee stipulated herein is based upon the understanding that the Constructor will subcontract a large portion or all of the work under this contract as follows:
(a) * * * The cost-plus-a-fixed-fee subcontracts will be employed only where the constructor determines that it is to the best interests of the United States, so recommends in writing, giving the reasons therefor, and obtains the approval of the Contracting Officer. * * *
5. The Contracting Officer may, without notice to the sureties, if any, at any time, by a written order, issue additional instructions, require additional work or services, or direct the omission of work or services covered by this contract. If such changes cause a material increase or decrease in the amount or character of the work to be done under this contract, or in the time required for its performance, an equitable adjustment of the amount of the fixed fee to be paid to the Constructor shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this Article must be asserted within 10 days from the date the change is ordered; provided, however, that the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and, with the approval of the Chief of Engineers, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article VII hereof. But nothing provided in this Article shall excuse the Constructor from proceeding with the prosecution of the work so changed; provided, however, that there shall be no adjustment in the amount of the fixed fee as provided herein, nor any claim therefor because of any errors and/or omissions made in computing the estimated cost of the construction of the work under this contract, or where the actual cost varies from the estimated cost.
*271 Aetiole II. — Cost of the Work
1. Reimbursement for Constructor's Expenditures.— The Constructor shall be reimbursed in the manner hereinafter described for such of his actual expenditures in the performance of the work as may be approved or ratified by the Contracting Officer and as are included in the following items:
H< H< H* H* H*
b. All subcontracts made in accordance with the provisions of this contract.
$ $ $ $ H¡
Article V. — Special Requirements
1. The Constructor hereby agrees that he will:
-fi iji 'I1
c. Reduce to writing, unless this provision is waived in writing by the Contracting Officer, every contract in excess of two thousand dollars ($2,000) made by him for the purpose of the work hereunder for services, materials, supplies, machinery, equipment, or for the use thereof; insert therein a provision that such contract is assignable to the Government; make all such contracts in Ms own name, and not bind or purport to bind the Government or the Contracting Officer thereunder. !]: * *
❖ Hi Hi Hi
Article VI. — Termination of Contract by Government
* # ❖ Hi Hi
3. Upon the termination of this contract, full and complete settlement of all claims of the Constructor arising out of this contract shall be made as follows:
a. The Government shall assume and become liable for all obligations, commitments, and claims that the Constructor may have theretofore in good faith undertaken or incurred in connection with said work, the cost of which would be reimbursable in accordance with the provisions of this contract; * * *
‡ $ H< ‡
Article VII. — Contracting Officer’s Decisions and Disputes.
The extent and character of the work to be done by the Constructor shall be subject to the general supervision, direction, control and approval of the Contracting Officer to whom the Constructor shall report and be responsible. All disputes arising under this contract shall be decided by the Contracting Officer, whose decisions shall be in writing, subject to written appeal by the Constructor within thirty (30) days to the Secretary of War or *272 bis duly authorized representative, whose decision shall be final and conclusive upon the parties hereto. In the meantime the Constructor shall diligently proceed with the work as directed.
Hi ‡ H' Hi H»
ARTICLE NX. — Definitions
V »ji Hi Hi H*
2. The terms “Secretary of War” * * * shall include their duly authorized representatives as the case may be other than the Contracting Officer.
3. * * * the term “Contracting Officer” shall mean the District Engineer of the United States Engineer District in which the contract work is being performed, his successor or duly authorized representative; * * *.
* * -•> -'S -J.:
The site of the Yigo Ordnance Plant was located about eight miles south of Terre Haute, Indiana, and covered an area of about twelve square miles. The total cost of the completed ordnance plant was slightly in excess of twenty million dollars.
4. On May 12, 1942, defendant by Change Order No. A, changed the terms of the principal contract by deleting therefrom “2 lines each to load 200,000 Detonators.”
5. On or about July 5 or 6, 1942, Mr. Edward W. Kaiser, Vice President and Treasurer of the plaintiff, received from The Esslinger-Misch Company copies of (1) an Invitation to Bid on a cost-plus-a-fixed-fee subcontract for the installation of the plumbing, heating, ventilation and compressed air systems at the Vigo Ordnance Plant, (2) Instructions to Bidders, and (3) a Plot Plan of the Vigo Ordnance Plant. At the time of receiving these documents Mr. Kaiser conferred with Mr. W. H. D. Hinchman, the resident director of the constructor, and several other men connected with the constructor. The Invitation to Bid was as follows:
To prospective bidders, Cost Plus Fixed Fee Contracts, Plumbing, Heating, Ventilation and Compressed Air Systems.
The following is the scope of work included in the Plumbing, Heating, Ventilation and Compressed Air Systems to be installed, complete ready to operate, in the Vigo Ordnance. Plant located near Terre Haute, Indiana.
*273 These systems are to be installed in Detonator Lines 1 to 6 inclusive; Artillery Primer Lines 1 to 4 inclusive, and Percussion Element Line No. 1 in Maintenance Area; Staff Houses, Fire and Police Building, Laboratory, Telephone and Cafeteria Building in the Administration Area.
The estimated total cost of this system by Ford, Bacon & Davis, Inc., Architect-Engineers, is the sum of $1,-988,984.00 made up of labor in the amount of $1,077,-200.00 and material at $911,784.00.
No complete plans of the work are available at the present time, but the work is scheduled to commence immediately, to be prosecuted diligently and to be completed by approximately December 15,1942. The work schedule will consist of two, ten-hour shifts per day, six days per week.
Bidders will be supplied with a set of General Conditions to be incorporated in the specification as prepared by Ford, Bacon & Davis, Inc., also, information required from prospective subcontractors which incorporates nine items pertaining to the subcontractors organization and Financial Status; also a copy of War Department, “Negotiation for Services for Subcontractor for Construction Work on a Cost Plus a Fixed Fee Basis”, which form is to be completed in detail and returned with the subcontractor’s bid.
It is imperative that all the information requested, including the financial statement, complete list of equipment, etc., be submitted at the time the bid is tendered.
Attached hereto is a copy of Instructions to Bidders.
The plot plan was a drawing on which were indicated the buildings to be erected and the distances between them as well as the general arrangement of the building groups and the buildings within each group.
6. At the time the invitation to bid and plot plan were furnished the plaintiff, there were not available sufficient drawings and specifications to enable the constructor to ask for bids on a lump-sum basis. The constructor knew that it would require several months to prepare sufficient drawings and specifications to enable a bidder to submit a lump-sum bid. Therefore, as there was an urgent need for early completion of the project so as to permit the manufacture of munitions for use in World War II, the constructor, in order to save this time, asked for and received permission from the defendant, in accordance with Article I-A(4) (a) *274 of the principal contract, to let the subcontract for the installation of the plumbing, heating, ventilation and compressed air systems at the Yigo Ordnance Plant on a cost-plus-a-fixed-fee basis.
7. On July 13, 1942, at 10:45 a.m., a meeting was held in Mr. Hinchman’s office at Terre Haute, attended by four prospective bidders on the proposed subcontract for plumbing, heating, ventilating and air lines, together with representatives of the defendant and the Bid Committee. It is not clear from the evidence whether the plaintiff was invited to have a representative present, but it is clear that no one from the plaintiff’s firm was present at the meeting.
The meeting was called to acquaint prospective bidders with pertinent information which might guide them in arriving at their bid which was due the following morning. A stenographic record of the meeting was made and although furnished to the plaintiff, it is not clear whether it was so furnished prior to the submission of the plaintiff’s bid.
8. On the morning of July 14, 1942, Mr. Edward W. Kaiser, Vice President and Treasurer of the plaintiff, arrived at Mr. Hinchman’s office between 8:30 and 9:00 o’clock. He was furnished with a copy of such plans as were available, including a plot plan showing the general layout of the entire ordnance plant. In addition, he was furnished with an estimate covering the cost of labor and materials for the installation of plumbing, heating, and ventilating systems at Vigo Ordnance Plant, which had been prepared by Ford, Bacon & Davis, Inc., the defendant’s architect-engineer for the project.
With this information at hand, Mr. Edward W. Kaiser, on July 14,1942, submitted on behalf of the plaintiff a bid which he prepared as follows:
We are pleased to submit the amount of fee, to include tools and equipment, for the installation of the Plumbing, Heating, Ventilation and Air Piping at the Vigo Ordnance Plant near Terre Haute, Indiana, at the sum of Forty-five Thousand Dollars ($45,000.00).
Our estimate does not include any equipment costing more than three hundred dollars ($300.00).
*275 9.On July 14, 1942, the bids received by the constructor were opened at 11:45 a.m., and were as follows:
E. J. Maag, East St. Louis, Illinois-$79, 600
Hayes Brothers, Indianapolis, Indiana- 48, 700
E. B. Kaiser Co., Chicago, Illinois- 45, 000
Turner-McCoy, Little Rock, Arkansas- 66,700
No representative of the plaintiff was present when the bids were opened. The plaintiff’s bid was accepted as the low bid provided it could produce evidence of ability to perform, including proper available equipment.
10.On July 20, 1942, the plaintiff furnished the constructor the list of its employees who would be engaged in full time charge of the work under the subcontract and the list of the equipment and tools which it had available for immediate shipment to the Yigo Ordnance Plant. By letter dated July 21, the plaintiff was notified as follows:
You are hereby notified of the award of a subcontract for the installation of Plumbing, Heating and Ventilating Systems in Detonator Lines 1-6 inclusive, Artillery Primer Lines 1-4 inclusive and Percussion Element Line #1, in the Maintenance Area; Staff Houses, Fire and Police Building, Laboratory, Telephone and Cafeteria Building in the Administration Area. This is in accordance with your bid of July 14,1942 on a Oost-Plus-a-Fixed-Fee basis of $45,000.00, based on an estimated cost of $1,988,984.00.
All work, construction etc., to be in accordance with Ílans and specifications prepared by Ford, Bacon & )avis, Inc., Architect-Engineers.
This work is to be commenced immediately, be prosecuted diligently and shall be completed as soon as possible.
Award of this subcontract is contingent upon your furnishing as agreed, list of equipment which would be available for use in connection with this work.
Acknowledgment of this Notice of Award is requested as provided herein.
11.On July 21, 1942, the plaintiff and Esslinger-Misch, the constructor, entered into Subcontract No. 27-42 for the installation of plumbing, heating and ventilating systems at Vigo Ordnance Plant for the fixed fee of $45,000.00 based upon the estimated cost of the work being $1,988,984.00. The pertinent provisions of the subcontract are:
*276 WheRBAS the Constructor (Contractor) has heretofore, to wit, on the 20th day of March 1942, entered into a contract * * * with the United States of America, hereinafter called the Government, to construct for the Government a Detonator Plant, at or near Terre Haute, Indiana; and
* * * * *
Whereas the Subcontractor has read and is familiar with each and every part of said principal contract, and the respective rights, powers, benefits, obligations and liabilities of the Constructor (Contractor) and the Government thereunder;
$ $ ‡ $
ARTICLE I
The Subcontractor shall in the shortest possible time furnish under the general supervision of the Constructor (Contractor) the labor, materials, tools, machinery, equipment, facilities, supplies, and services not furnished by the Constructor (Contractor) or the Government and do all things necessary for the construction and completion of the following work:
To construct, install and complete all plumbing, heating, ventilating and compressed air systems in six (6) Detonator Lines, four (4) Artillery Primer Lines, one (1) Percussion Element Line, in the Maintenance Area, and in the following buildings in the Administration Area: Staff Houses, Fire and Police Building, Laboratory, Telephone and Cafeteria Building.
All small tools, not exceeding $300.00 in value, necessary and essential to a satisfactory completion of the work hereunder, will be furnished by the Subcontractor on a nonreimbursable basis. All materials and supplies to be furnished by the Constructor (Contractor) or the Government.
The Subcontractor shall furnish a full time General Superintendent on a nonreimbursable basis who will be responsible for the effective prosecution of the work to be performed hereunder.
Said work shall conform, insofar as practicable, with typical designs, drawings, specifications, details, standards or instructions furnished by the Constructor (Contractor).
It is estimated that the construction cost of the work covered by. the Subcontract will be One Million Nine Hundred Eighty-eight Thousand Nine Hundred Eighty-four Dollars ($1,988,984.00) exclusive of the Subcon *277 tractor’s fee, and that the work herein contracted for will be completed within 147 days from the date of this contract. It is expressly understood, however, that the Subcontractor does not guarantee the correctness of either of these estimates. The estimated cost set forth above is based upon the data now available and agreed to by the Constructor (Contractor), Subcontractor and the Contracting Officer.
article n
In the performance of this subcontract, the Subcontractor binds himself to the Constructor (Contractor) and to the Government to comply fully with all the undertakings and obligations of the Constructor (Contractor), excepting such as do not apply to the Subcontractor’s work as are set forth in the principal contract, No. W559eng-5949, a copy thereof having been furnished the subcontractor, which is hereby adopted and made a part of this subcontract. Additional copies of the principal contract are on file in the offices of the Contracting Officer and the Chief of Engineers.
‡ ^ sfc #
ARTICLE VI
The Subcontractor shall be reimbursed by the Constructor (Contractor) in the manner described, and subject to the same conditions provided in the principal contract for such cost of the work designated in Article I hereof as may be included in said principal contract; when such work and cost thereof have been approved by the Contracting Officer; provided, however, that such reimbursement shall not include any cost of the said work which has been paid by the Constructor (Contractor) or the Government.
The Subcontractor shall also be paid by the Constructor (Contractor) a fixed fee of Forty-five Thousand Dollars ($45,000.00) as full compensation for his services including profit and all general overhead expenses. The said fixed fee shall be paid by the Constructor (Contractor) in the same manner in which the payment of the fixed fee to the Constructor (Contractor) is made by the Government as set forth in said principal contract.
Subject to the approval of the Contracting Officer, the Constructor (Contractor) may by written order change the scope, extent or amount of the work covered by this subcontract. If any such change causes a material increase or decrease in the amount or character of *278 such work or in the time required for its performance, an equitable adjustment of the fixed fee to be paid to the Subcontractor shall be made, subject to the approval of the Contracting Officer; and this subcontract shall be modified in writing accordingly. Provided, however* that there shall be no adjustment in the amount of the fixed fee as provided herein, nor any claim therefor because of any errors and/or omissions made in computing the estimated cost of the construction of the work under this subcontract, or where the actual cost varies from the estimated cost.
*****
ARTICLE XI
All disputes arising under this subcontract shall be decided by the Contracting Officer, whose decision shall be in writing, subject to appeal by either party hereto within 30 days from the receipt of the Contracting Officer’s decision, to the Chief of Engineers whose decision shall be final and conclusive upon the parties hereto. Notwithstanding this provision, the Subcontractor shall diligently proceed with the work as directed. *****
ARTICLE Xm.
The term “Contracting Officer” refers to the Contracting Officer who executed the principal contract or to his duly appointed successor or authorized representative. *****
12. The plaintiff began work under its subcontract within a few days after July 21,1942. On November 17, 1942, the contracting officer ordered all work on Artillery Primer Line No. 4 and Detonator Line No. 6 stopped. During the progress of the work, the plaintiff was required to perform certain work beyond the scope of the subcontract, including the water treatment plant and the sewage disposal plant together with its lift station. By the end of February 1943, the plaintiff had practically completed all of its subcontract work and only a few employees were thereafter retained for the first two weeks in March to wind up the subcontract. One employee was retained until April 2, 1943, the date the plaintiff’s work was accepted as complete. However, this employee devoted practically his entire time from the latter part of December 1942, in compiling the data which the *279 plaintiff used to support its claim to the constructor for the extra work and for alleged extra work performed by the plaintiff.
13. On March 9, 1943, the plaintiff filed a claim with the constructor in the amount of $750 for reimbursement for the cost of a Wilson electric welder which it said was purchased by it for the account of the defendant. On July 3, 1944, the defendant’s contracting officer made findings of fact and denied the claim. The plaintiff appealed to the Secretary of War on August 1,1944. On September 9,1944, the Chief of Engineers, by direction of the Secretary of War, sustained the contracting officer’s findings and denied the claim. During the course of the hearing the plaintiff abandoned its claim for reimbursement for this Wilson electric welder for which it had made claim in paragraph 12(a) of its petition.
14. On March 11, 1943, the plaintiff filed claim for reimbursement of salaries paid to Superintendents Walter Eck, Frank Marshment, Harry Ermatinger, and Arthur I. Man-glesdorf. On October 30, 1944, the defendant’s contracting officer prepared findings of fact on the claim and allowed $71.78 and denied the balance of $843.55. On November 9, 1944, the plaintiff appealed this decision and the decisions on several other items to the Secretary of War. On February 28, 1945, the Chief of Engineers sustained the contracting officer’s decision and denied the claim. During the course of the hearing the plaintiff abandoned its claim for reimbursement of salaries paid to the superintendents which was set out in paragraph 12(b) of its petition.
15. Toward the end of December 1942, or early in January 1943, the plaintiff instructed Mr. George C. Piller, its estimator and expediter, to prepare data for use in presenting claims to the constructor for what the plaintiff considered extra work performed by it. At about the end of February 1943, the plaintiff began to discuss these claims informally with the constructor. On April 6, 1943, it submitted a formal statement to the constructor setting forth its estimated value of the work which it allegedly had done in addition to the work contemplated by its subcontract. At some undetermined time thereafter the constructor sub *280 mitted to the plaintiff Proposed Change Order No. 1 which the plaintiff refused to accept. On May 3, 1943, the plaintiff submitted another letter to the constructor wherein it .listed certain items and the estimated cost thereof which it claimed was extra work. On May 6, 1943, Mr. George A. Newhall, Acting Project Manager for the constructor, transmitted the plaintiff’s letter of May 3 to the defendant’s area engineer. Mr. Newhall’s letter stated, in part, as follows:
3. A careful and detailed review of the original estimate of the work included under this subcontract and subsequent estimates, all prepared by the Architect-Engineers, reveals that the work performed by this subcontractor in the Water Treatment Plant and the Sewage Disposal Plant was not sufficiently detailed at the time that this subcontract was entered into to amply include cost of the work therein performed by this subcontractor, and inasmuch as these two plants were not mentioned in the description of the work set forth in the subcontract, it is considered that the subcontractor here performed work as directed beyond the scope of his contract in the following particulars:
(a) Water treatment plant:
Reservoir_ §828
Treatment plant, piping (exclusive of equipment)_ 38,250
Wells area, piping- 5,775
Estimated cost labor and materials_ 44, 853
(b) Sewage disposal plant:
Sentry boxes, ventilation—
Sewage lift station, piping. r-f
Sewage plant, piping_ rd
Estimated cost labor and materials- 18, 331
Summary:
Estimated cost of work performed beyond the scope of this subcontract:
Water treatment plant_ 44,853
Sewage disposal plant- 18,331
63,184
4. Attention, is directed to the attached copy of a letter dated May 3, to The Esslinger-Misch Company from E. B. Kaiser Company setting forth estimated costs of items of work claimed to have been performed beyond the scope of their subcontract. This claim has been reviewed in detail, and we submit the following comments:
*281 (a)Boiler homes and overhead steam lines — The estimates submitted by the subcontractor are entirely out of line as compared with the Constructor’s actual figures of final coste. Furthermore, the subcontractor’s contention that the boiler houses and steam lines to the pressure reducing valves are power and not heating and, therefore, not included in his subcontract work is in our opinion erroneous. There is no steam generated in any of the boiler houses for any purpose other than heat,, and the boilers and other equipment are designed for comparatively low pressure heating and not high pressure power steam such as would be necessary if these boiler houses were power plants with electric generating turbines and generators as part of the equipment. It is pointed out further that the cost analysis of this project indicates the following costs for the five boiler houses:
Buildings (not included in E. B. Kaiser’s contract) _ $481,259
Boilers and equipment_ 161, 069
Boiler house piping_ 93, 800
Overhead steam lines___ 238,200
Value of mechanical work in place:
Boilers, equipment, and overhead steam lines for five boiler houses_ 493, 069
This work was included in the Architect-Engineers estimate of $1,988,984, and it is recommended that the subcontractor’s claim (a) be denied.
(b) Sewage disposal plant. — It is recommended that this item be considered as work performed beyond the scope of the subcontract on the basis set forth above under paragraph 8(b) derived from the subcontractor’s actual breakdown of labor costs amounting to $8,568 and exclusive of equipment furnished by the Dorr Company, with which this subcontractor was not concerned. No further allowance is recommended.
(c) Water treatment plant. — It is recommended that this item be considered as work beyond the scope of the subcontract as set forth under item 3(a) derived from the subcontractor’s own labor breakdown in the amount of $19,946 and exclusive of the equipment furnished by Infilco Company with which the subcontractor is not concerned. No additional amount is recommended.
»{• if* H'
5. General summary. — The following is recommended from the details above presented:
*282 Incomplete work Det. Line #6, deduct-$171. 513
Incomplete work A. P. #4, deduct- 103, 890
Total deductions, Det. Line #6 and A. P. #4_$275,403
Water treatment plant, including reservoir and well area, add_ 44, 853
Sewage disposal plant and lift station, add_ 18, 331
Total additional work- 63,184
(a) to (e) inclusive as submitted by subcontractor, denied or included in above.
Net decrease_ 212,219
In the determination of our recommendation for final settlement of this subcontract, the following facts have been considered. The final labor and material cost analysis of work performed under this subcontract reveals that the Architect-Engineers estimate upon which the fixed-fee was based was adequate and reasonable and slightly higher than the actual costs. Our determinations of the values of incompleted work and work performed beyond the scope of the subcontract were based on the Architect-Engineers estimates and actual payroll breakdowns furnished by the subcontractor. These determinations are therefore considered equitable.
The estimate submitted by the subcontractor for work performed by him beyond the scope of his subcontract exceeds the actual total labor and material cost of the work performed by his forces, and therefore is not recommended as just and equitable.
Since the incompleted work resulted from a directive abandoning construction on two entire load lines, it is recommended that the amount of this subcontract be accordingly reduced provided that due credit be given for work actually performed in these lines plus the additional work completed beyond the scope of the subcontract, all as set forth in the above summary, which results in a decrease in the estimated cost of $212,219, and a proportionate decrease in the fixed-fee of $4,800, and that approval be given to Change Order No. 1, enclosed', which the subcontractor has declined to accept.
16. On May 11, 1943, the constructor sent the following letter to the plaintiff, being proposed Change Order No. 1:
Reference is made to Article I of your Cost-Plus-A-Fixed-Fee Subcontract No. 27-42, dated July 21, 1942, for the construction and installation of all plumbing, heating, ventilating and compressed air systems at the Vigo Ordnance Plant as more fully described therein.
*283 In order to provide adequate facilities for the operation of Vigo, Ordnance Plant, it has been determined that a complete water treatment plant and sewage disposal plant are essential. Therefore, under the provisions of Article VI of your contract, Article I thereof is modified to include all plumbing, heating, ventilating and compressed air work necessary in connection with these two plants neither of which were contemplated at the time of award of the work covered by your Subcontract. The estimated cost of the work to be performed by you in connection with these two plants is as follows:
Item 1. Water treatment plant,
a. Reservoir. Placing steel rodent guard:
1. Labor_ $432. 00
2. Material_ 396.00
$828.00
b. Piping and Installation:
1. Labor_ 19,900. 00
2. Material_ 18,350.00
38,250.00
c. Connecting wells to water system:
1. Labor_$2,950.00
2. Material- 2,825.00
$5,775.00
Total_ $44,853.00
Item 2. Sewage disposal:
a. Ventilation (Sentry boxes):
1. Labor_ 52. 00
2. Material- 47.00
- 99.00
b. Sewage lift station:
1. Labor_ 875.00
2. Material_ 807. 00
- 1,682.00
c. Piping:
1. Labor_ 8,570.00
2. Material_ 7,980. 00
- 16,550.00
Total_ 18,331.00
Item 3. Directives have been received from the Government to discontinue all work in connection with Detonator Line No. 6 and Artillery Primer Line No. 4; therefore, your Subcontract is modified by deleting from Article I thereof any and all plumbing, heating, ventilating and compressed air work required to be performed under your Subcontract with respect to these two lines which has not already been completed. The estimated *284 cost of the incompleted work of plumbing, heating, ventilating and compressed air systems pertaining to Detonator Line No. 6 is $171,513.00, and the estimated cost of incompleted work pertaining to Artillery Primer Line No. 4 is $103,890.00, making a total cost of the in-completed work for this Item of $275,403.00.
Item 4. Because the application of insulating material on pipes, ducts and equipment as specified is a necessary part of the complete plumbing, heating, ventilating and compressed air systems under yofir Subcontract,- and because you have not undertaken this work or provided for its accomplishment, it has been determined that in the interests of the work as a whole, all pipe covering and insulation of ducts and equipment be deleted from your Subcontract and that Article I of the Subcontract be and is hereby modified accordingly. The estimated cost of this work is as follows:
Labor_$64, 057.00
Material_ 32, 870.00
Total __ 96, 927.00
Item 5. In order to provide for the operation of certain of the completed lines by the using agency, and in order to prevent a conflict between the various labor crafts, it has been determined that you shall furnish necessary operators and maintenance men to fire the boilers and maintain completed lines until other phases of your work have been completed and accepted. You are, therefore, ordered to furnish such services as required for this purpose and Article I of your Subcontract is modified accordingly. This additional work required is not considered to be a material change in the amount or character of the work to be performed by you under your Subcontract and accordingly no adjustment of your fixed-fee will be made.
None of the above estimates of costs of items of work to be deleted or added are guaranteed by either the Subcontractor or the Contractor but are agreed to be the best available estimates. There shall be no adjustment of the fixed-fee nor shall there be any claim for increased compensation because of any errors and/or omission made in computing the above estimates or where the actual construction cost differs from the estimated cost of construction.
The changes in the scope of the work outlined in Items 1, 2, 3, 4, and 5 are all considered within the meaning *285 of Article VI of your Subcontract. Changes in the scope of the work included in Items 1 and 2 as outlined above will result in an increase in the fixed-fee to be paid you under Article VI of your Subcontract in the amount of $1,429.00, and the changes in the scope of the work included in Items 3 and 4 as outlined above will result in a decrease in the fixed-fee to be paid yon under Article VI of your Subcontract in the amount of $8,424.00. This will result in a net decrease in your fixed-fee of $6,995.00.
It is understood and agreed that all other terms and conditions of the Subcontract shall be and remain the same.
Therefore, if the foregoing modification of your said Subcontract is satisfactory, please indicate your acceptance thereof in the space provided below.
17. On May 26,1943, the plaintiff acknowledged receipt of the change order and returned it unsigned as it did not consider the change order to be an equitable basis of settlement. The plaintiff stated in its letter the following reasons for not signing the change order:
sfc «i*
In our letter to you of May 3, 1943, we pointed out that we were entitled to have the work in connection with the boiler houses considered as outside the scope of our sub-contract for the reason that the boiler houses (steam generating systems) and the high pressure steam piping are not included in the terms of heating systems as covered by our sub-contract. Normally heating systems do not include steam beyond fifteen pounds working pressure. When high pressure steam is used to supply steam for heating purposes, the heating system starts in the pressure reducing stations. In all such cases the power (boiler) houses, or high pressure steam generating plant, is a separate and independent unit. High pressure steam is used for purposes other than heating, the heating phase being merely incidental, consequently the additional mechanical construction of boiler or power houses was not a factor upon which we had based our fee.
This item and the other items of additional or extra mechanical construction work so performed by us at your direction and not considered when fixing our $45,-000.00 fee under the sub-contract are as follows:
*286 Boiler Houses and High Pressure Steam Lines_$1,337, 418. 00
Sewage Disposal Plant and Lift Station #1_ 137, 629. 00
Water Treatment Plant, Pumping Plant and Reservoir - 109, 572. 00
Wells 1, 2, and 3_ 29, 768.00
Connecting Manufacturing Equipment_ 93,240. 00
Concrete Water Towers (Labor Furnished to another contractor)_ 3,123.00
Kitchen Equipment (Labor furnished to another contractor) _ 700. 00
Laboratory Equipment (Labor furnished to another contractor )_ 2, 046. 00
Maintaining all Boiler Houses and Lines_ 37, 000. 00
Fire Station #T-2101_ 5,000.00
Reproduction Building #T-114_ 3,000.00
Temporary Water Lines_ 6, 009.00
Sheet Metal Wort for Sentry Boxes_ 8,125. 00
Sheet Metal Work for Ramp Doors_ 8, 000. 00
Temporary Railroad Water Tower_ 1,350. 00
Change House #T-314_ 5, 000. 00
Addition to Fire Station #T-109_ 10, 000. 00
Miscellaneous Pieces of Extra Work_ 12, 000. 00
Total - 1, 808,971. 00
None of such $1,808,971.00 was a part of nor included within the terms of the work specifically described in onr subcontract 27-42 with you, and, on the basis of a fixed fee of $45,000.00 for a total of the original estimated mechanical construction cost of $1,988,984.00, we should be paid an additional fee of $40,722.50 for such extra or additional work.
* * ife * sf;
18. During the course of the trial, the plaintiff abandoned all of its claims for extra work except the following items:
Boiler houses and high pressure steam lines;
Sewage disposal plant and lift station; and
Water treatment plant, pump' plant and reservoir.
19. On June 4, 1943, the plaintiff’s subcontract was assigned to the defendant by the constructor in accordance with Article VI of the principal contract. Defendant thereby assumed the responsibility for the claims previously filed by the plaintiff with the constructor. The defendant thereafter renumbered the plaintiff’s subcontract, and it became Subcontract No. W559eng-7018 instead of Subcontract No. 27-42.
20. On June 4, 1943, the constructor’s resident director transmitted to the defendant’s area engineer his recommendation for the final settlement of the plaintiff’s subcon *287 tract and the disputes that had arisen, between the constructor and the plaintiff. This letter stated, in part, as follows:
7. Change Order No. 1 was submitted to the subcontractor, E. B. Kaiser Co., for approval under date of May 22, 1943. The subcontractor’s reply, dated May 26, 1943, declines to accept the Change Order, claims 18 items of extra work totaling $1,808,971.00, and makes no mention of the incompleted work resulting from the directive from the Area Engineer, dated May 17th, stopping construction on Detonator Line No. 6 and Artillery Primer Line No. 4. A copy of the subcontractor’s letter was sent to the Area Engineer and reference is made thereto. The following comments are made with regard to the subcontractor’s claim:
1. Boiler Houses and High Pressure Steam Lines.— This work comprised a major portion of the construction under this subcontract and was solely for the purpose of producing heating steam and transmitting same to the various load line areas. The subcontractor’s claim, that the work does not come under the division of heating in the subcontract, is inconsistent with the understanding had by all parties concerned at the time that this contract was entered into and is without foundation. It is recommended that the claim be denied.
2. Sewage Disposal and Lift Station #1. — This item is covered by Change Order No. 1, Item 2, and more fully described under Paragraph 3 of this letter. It is recommended that funds claimed by subcontractor for this item, in excess of that granted in the Change Order, be denied.
3. Water Treatment Plant, Pumping Plant amd Reservoir. — This work is covered by Change Order No. 1, Item 1, and more fully explained under Paragraph 3 of this letter. It is recommended that any additional funds claimed, beyond those provided by the Change Order for this item be denied.
'A: * % * *
On July 7, 1943, Captain Paul S. Bailey, the defendant’s contracting officer, submitted to the plaintiff his decision on the disputes between the constructor and the plaintiff concerning Change Order No. 1 and the plaintiff’s letter of May 26, 1943, wherein the plaintiff refused to accept said change order. The decision of the contracting officer was, in part, as follows:
*288 4. The Contracting Officer has thoroughly considered the various items set out in Change Order No. 1 dated May 11,1943, and has arrived at the following decisions with respect to the various items shown:
a. With respect to Item 1 of Change Order No. 1 the Contracting Officer has had a complete analysis made of the labor and material costs involved in connection with the work performed by the Subcontractor under this item and finds that the deduction of $44,853 is just and reasonable for the work performed and that the work involved was bejmnd the scope of the work called for by the Subcontract and that the contract cost should be increased by the sum of $44,853.
b. With respect to Item 2 Change Order No. 1 the Contracting Officer has had a complete analysis made, of the labor and material costs involved in connection with the work performed by the Subcontractor under this item and finds that the deduction of $18,331 is just and reasonable for the work performed and that the work involved was beyond the scope of the work called for by the Subcontract and that the contract cost should be increased by the sum of $18,331.
g. With respect to Item 3 while the Subcontractor has not protested the reduction in contract price set out in Change Order No. 1, the Contracting Officer has verified
Item 3. Water Treatment Plant, Pumping Plant a/nd Reservoir
The decision on this item is covered by the decision on Item 1 of Change Order No. 1 which is set forth in Paragraph 4 above.
* * ❖ ❖ *
7. This decision of the Contracting Officer is rendered in accordance with Article VII of Principal Contract No. W 559 eng-5949 as applicable to CPFF Subcontract No. 27-42. Under Article VII of the Principal Contract the Subcontractor has thirty days from the date of the receipt by him of this decision in which to present his appeal in writing to the Secretary of War or his duly authorized representative. In the event that the Subcontractor desires to appeal from this decision, the appeal should be addressed to the Chief of Engineers, War Department, Washington, D.C., and forwarded through this office.
The plaintiff acknowledged receipt of the contracting officer’s decision as of July 9, 1943.
21. On August 6, 1943, the plaintiff timely appealed the *289 decision of the contracting officer to the Chief of Engineers through the area engineer.
22. On August 6, 1943, Captain Paul S. Bailey, the defendant’s contracting officer, prepared findings of fact on questions in dispute between the constructor and the plaintiff. These findings of fact are, in part, as follows:
*
4. The estimated cost of the construction and installation of the various systems called for under the CPFF Subcontract No. 27-42 as prepared by the Architect-Engineer was $1,988,984.00 exclusive of the Subcontractor’s fixed fee of $45,000. The Subcontract contained the usual stipulation as to correctness of the estimates which is set forth in Article I of the Subcontract in the following language:
“It is expressly understood, however, that the Subcontractor does not guarantee the correctness of either of these estimates. The estimated cost set forth above is based upon the data now available and agreed to by the Constructor (Contractor), Subcontractor and the Contracting Officer.”
This estimate as prepared by the Architect-Engineer was very general in its scope and included labor and materials only. It did not include equipment.
❖ * * * *
the figures set out in Item 3 of Change Order No. 1, by the Principal Contractor and finds that a figure of $275,403 is just and reasonable and that the amount should be deducted from the contract cost. '
5. The Subcontractor in his letter of May 26, 1943, above referred to, goes to considerable length in attempting to justify his claim for $1,808,971 for the eighteen items which he has set out at the top of Page 3 of his letter, and which for convenience to this decision are set out in Paragraph 3 above. The Contracting Officer has thoroughly considered each of those claims advanced by the Subcontractor and in order that the Subcontractor may exercise his right of appeal in connection with these claims which the Principal Contractor has denied, the following is the Contracting Officer’s decision with respect to each:
Item 1. Boiler Houses and High Pressure Steam Lines
The reason advanced by the Subcontractor, for the allowance of this Item is that the boiler houses (steam *290 generating systems) and the high pressure steam piping were not included in the terms of heating systems as covered by the Subcontract. He further contends that normally heating systems do not include steam beyond fifteen pounds working pressure and that when high pressure steam is used to supply steam for heating purposes, the heating system starts in the pressure reducing station. The work involved in connection with the boiler houses and steam lines conprises [sic] a major portion of all the work contemplated by the Subcontract. With respect to this claim the Contracting Officer finds that the boiler houses and the steam lines are integral §arts of one or the other of the systems referred to in the ubcontract; that while the steam generated in these boiler houses is in excess of fifteen pounds working pressure, it is used solely for heating purposes and not for generating of power; that the work performed by the Subcontractor in connection with boiler houses and steam lines was work within the scope of the Subcontract and that his claim for $1,837,418 should be and is denied.
Item 2. Sewage Disposal Pla/nt amd Lift Station
The decision on this item is covered by the decision on Item 2 of Change Order No. 1, as set forth in Paragraph 4 above.
7. a. In his letter, Exhibit “B”, the Subcontractor points out as to Item 1 of the Change Order, Water Treatment Plant, that he should be allowed the sum of $109,572 for work performed by him as against the $44,853 allowed by the Change Order but submits no breakdown as to how their costs were arrived at. The figure of $44,853 as allowed by Change Order No. 1 for this work is the estimated cost of all labor and material entering into the work and does not contemplate the cost of equipment which is evident that the Subcontractor has included in his cost. As to Item 2, Sewage Disposal Plant, he contends that this figure should be $137,629 as against the $18,331 allowed by Change Order No. 1. Again it would seem that the Subcontractor included the cost of the equipment, whereas Change Order No. 1, is based on the estimated cost of labor and materials. The estimated cost of both items 1 and 2 have been thoroughly checked by this office and the figures arrived at are substantially in accord with those as so set out in Change Order No. 1.
b. With respect to the deduction of $275,403 by Change Order No. 1 as a result of a directive to discontinue work in connection with Detonator Line No. 6 and Artillery *291 Primer Line No. 4, the Subcontractor contends that the work called for by the Subcontract on these lines was 20% complete before the work was stopped and that Change Order No. 1 should be modified accordingly. A check of the records indicates that the work which had been performed in these two areas, labor and material, did not exceed $12,000 which does not even approach 20% of the cost of the work in these two lines as contemplated by CPFF Subcontract No. 27-42.
* * * * *
9. Findings: From the foregoing facts the Contracting Officer finds:
a. That the determination of the Constructor-Contractor, The Esslinger-Misch Co., as set forth in Change Order No. 1 to Subcontract No. 27-42 dated May 11, 1943, is a reasonable determination; that the additional work called for under Items Nos. 1, 2 * * * is outside the scope of the work contemplated by this Subcontract; that the estimated cost thereof is just and reasonable; * * *.
b. That with respect to the claim of the Subcontractor that the Contract cost be increased in the amounts set out at the top of Page 3 of his letter of 26 May 1943 (Exhibit “B”), the Contracting Officer finds:
(1) That the claim for $1,337,418 for work performed in Boiler Houses and on Steam Lines, was work contemplated by and was within the scope of the work called for in the Subcontract; that this work was included in the original estimated contract cost of $1,988,-984 and further, that the Subcontractor is not entitled to an increase in his fixed fee as a result of any work performed 'by him in connection with this phase of the work, and
(2) That the claim of the Subcontractor in the amount of $137,629.00 for work performed in connection with the Sewage Disposal Plant and Lift Station No. 1 was work not within the scope of the work contemplated by the Subcontract and should be allowed in accordance with the findings and in the amount as set forth in 7 a. above, and
(3) That the claim of the Subcontractor in the amount of $109,572 for work performed by him in connection with the Water Treatment Plant, Pumping Plant & Reservoir, was work not within the scope of the work contemplated by the Subcontract, and that it should be allowed in accordance with the findings and in the amount set forth in 7 a. above, and
$ # * * *
*292 In transmitting the above findings of fact, the contracting-officer advised the plaintiff as follows:
With reference to your protest dated 26 May 1943 to-Change Order No. 1 to Subcontract No. 27-42 and your claim for additional items set out in your protest, there-is inclosed herewith copy of Finding of Fact in connection therewith by the Contracting Officer.
Since you have already submitted your appeal from the decision of the Contracting Officer of 7 July 1943,. it is possible that you will have no further comment to make in connection with this Finding of Fact. However, should you care to submit additional data on the-points covered by the Finding of Fact, you should submit the same direct to the District Engineer, Louisville-Engineer District, Box 59, Louisville, Kentucky, within ten (10) days from the date of this letter.
23. By letter dated August 11,1943, the plaintiff submitted exceptions to the contracting officer’s-findings of fact and' asked that the exceptions be transmitted to the Chief of Engineers in connection with its appeal from the decision of' the contracting officer set out in finding 22. .
24. On February 10, 1944, Major General Thomas M.. Robins, Acting Chief of Engineers, advised the plaintiff concerning his decision on its appeal of August 6,1943. Said! decision states, in part, as follows:
* if: % *
* * * You claim that certain of the work required of you was outside the scope of the work described in your contract and that certain deletions of work provided for in change order were improper in that you were not required by the terms of your contract to do-this work. With the above description of work required to be accomplished in mind, I will herein consider the-various items of work which you contend were outside-the scope of the work to be accomplished, which are enumerated as follows:

*293 You contend that the construction of the boiler houses and high pressure steam lines, Item 1 of the above list, was outside the scope of the work described in your contract and accordingly, your fee should be increased because of - this added work. The express language of your contract obligates you to construct, install and complete all plumbing, heating, ventilating, and compressed air systems in the six (6) Detonator Lines, four (4) Artillery Primer Lines, and one (1) Percussion Element Line, and the Maintenance Area. I find that the boiler houses and steam lines were a part of the plumbing and heating work described in your contract and were_ within the scope thereof. You contend that the estimate upon which the amount of work was computed did not include the construction of the boiler houses and high pressure steam lines, and for that reason was not intended to be a part of the work under your subcontract. The express provision of your contract provides that no adjustment in fixed fee will be made because of errors or omissions in estimating the cost of the work. As .1 have found that the boiler houses and high pressure steam lines were part of the work described in your contract, I conclude that no increase in your fee can be made for the construction of such items.
Items 2, 3, * * * of the foregoing list are recognized by Change Order No. 1 as being without the scope of the work described in your contract, and the increase in fixed fee provided therein is based on an estiamted [sic] cost of $63,184. You contend that the cost of these items far exceeded the estimate provided in the Change Order. Your costs are computed on the total cost, including operating equipment and materials installed by others, and are not the labor costs only which were furnished by you in the completion of your portion of the contract work. I am of the opinion and so find that the estimated [sic] set forth in the Change Order are sufficient for the purposes of computing an equitable adjustment in your fee for such items.
* * * * *
Summarizing, my decision is as follows: I have found that there has been added to the work described in your contract items estimated to cost $153,660. I find that there was deleted from the subcontract work estimated to cost $275,403. According [sic], I find that there was a net decrease in the estimated cost of work accomplished by you in the amount of $121,743. For this decrease in the amount or character of the work performed, I find *294 that your fee should be reduced $2,755, leaving a net fee for the work accomplished in the amount of $42,245.
The contracting officer will be instructed to prepare a supplemental agreement in conformity with this decision.
The Chief of Engineers allowed a part of the plaintiff’» appeal relative to claims not now in controversy, as the plaintiff has abandoned these claims for additional compensation.
25. The evidence shows that the decision and the findings of fact of the contracting officer relative to the items claimed by the plaintiff as sustained by the decision of the Acting Chief of Engineers are correct and accurately state the facts concerning such items claimed. There is no evidence of arbitrary or capricious action by the contracting officer or the Acting Chief of Engineers. As to the largest claim by the plaintiff relating to boiler houses and high pressure steam lines, it is observed that the plot plan shows a total of five boiler houses, three in the detonator line areas and two in the artillery primer line areas. The plaintiff has failed to establish by clear and satisfactory evidence that the boiler house and high pressure steam line work was outside the scope of its subcontract work. Similarly, the plaintiff has failed to establish by clear and satisfactory evidence that it has not been fully paid for the extra work performed by it on the sewage disposal plant and the water treatment plant. The estimates of cost relied upon by the plaintiff as to these items include major items of equipment which were not installed by the plaintiff’s employees.
26. All of the materials used by the plaintiff in the performance of its subcontract were purchased by the constructor. The plaintiff’s employees were paid by the plaintiff, and all such payments were reimbursed to it except for the salary of the plaintiff’s general superintendent. The plaintiff’s total payroll for the entire job, not including the general superintendent’s salary, was slightly less than $800,000.
27. On February 25,1944, the defendant submitted Modification No. 8 (change order) to the plaintiff, of which the following is pertinent:
*****
Provide the necessary services incident to the following changes in the work:
*295 1. delete approximately 86.5 percent of the work for detonator line number six (6) and artillery primer line number four (4).
2. add a. Water treatment plant, complete, including reservoir, piping and installation and connecting wells to water system.
b. Sewage Disposal Plant, complete, including ventilation, sewage lift station and piping.
*****
The foregoing modifications will result in the following changes in the principal contract.
Estimated cost of work deducted by this Change Order_$121, 743. 00
Fixed-Fee, this Change Order, decrease- 2, 755.00
There is no Change Order No. 1 under this contract and the reference to Change Order No. 1 appearing in Modification No. 2 is hereby deleted from Said Modification No. 2.
This change order was agreed to and accepted by the plaintiff on April 8,1944, and was signed under protest.
On April 21, 1944, the plaintiff executed a Final Release for all claims excepting certain claims which have since been abandoned by the plaintiff and also excepting the following claim:
*****
(2) Our claim for the payment to us of an additional fee for extra or additional work performed by us at Vigo Ordnance Plant under the terms of our said subcontract, on Power Houses and High Pressure Steam Lines, Connecting Equipment installed by other subcontractors and additional allowance for our extra work on the Sewage Disposal Plant, Water Treatment Plant and Water Wells fully set forth in our appeal of August 6, 1943 and exhibits thereto and in our exceptions of August 11, 1943, both directed to the Findings of Fact and Decision of the Contracting Officer on the Dispute between The Esslinger-Miseh Co., Principal Contractor under CPFF Contract No. W559 Eng. 5949 and the undersigned under its CPFF Subcontract No. 27-42, which have been the subject of discussion and correspondence between the office of the Chief of Engineers at Washington, D.C. and the undersigned.
*****
On July 16,1945, the plaintiff executed the Final Payment Release wherein it released the defendant from all claims *296 excepting certain claims which, have since been abandoned by the plaintiff and also excepting the following:
* * ❖ * *
Claim amount of $40,722.50 (Additional fees)
* * * * *
On July 28, 1945, the plaintiff received its final fixed-fee payment under the subcontract, accepting it under protest as to disallowance of claims for $40,722.50 covering additional fees on additional work, and protesting also the disal-lowance of claims for items which have since been abandoned.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 Plaintiff’s present claims were originally before this court in case No. 46623 in which case Commissioner Day filed a report. In the present case, since plaintiff chose not to offer any additional evidence, Commissioner Marion T. Bennett, to whom this case had been referred, adopted as his report the findings of fact previously made by Commissioner Day.